IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

CZAPLA V. DENNIS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

BRENT J.T. CZAPLA, APPELLEE,

V.

ERIKA M. DENNIS, NOW KNOWN AS ERIKA M. ROBINSON, APPELLANT.

Filed May 21, 2013.    No. A-12-670.

Appeal from the District Court for Douglas County: PETER C. BATAILLON, Judge. Affirmed.

Jeff T. Courtney, P.C., L.L.O., for appellant.

James M. Buchanan, P.C., L.L.O., for appellee.

INBODY, Chief Judge, and IRWIN and MOORE, Judges.

MOORE, Judge.

## INTRODUCTION

Erika M. Dennis, now known as Erika M. Robinson (Erika), appeals from the paternity decree entered by the district court for Douglas County, which determined that Brent J.T. Czapla (Brent) was the father of the parties' minor child, awarded sole legal custody to Brent and joint physical custody to the parties, and calculated child support. Erika challenges the custody award and the court's determination of Brent's income for child support purposes. Because we find no abuse of discretion, we affirm.

## BACKGROUND

Erika and Brent are the biological parents of Aiden Czapla, who was born in June 2010. Prior to Aiden's birth, the parties had a relationship while both were living in Omaha, Nebraska. Aiden was born in South Dakota where Erika lived at the time, although she has since moved back to Omaha. Erika was 22 years old at the time of Aiden's birth, and Brent was 23. After Aiden's birth, the parties verbally agreed and attempted to follow a "week-on and week-off"

- 1 -

parenting time arrangement. On July 30, the parties signed a parenting plan that included a joint custody arrangement. The events surrounding the signing of that plan and its details are discussed more thoroughly below.

Brent filed a complaint for determination of paternity in the district court on July 27, 2010. Brent alleged that he had voluntarily submitted to genetic testing proving him to be Aiden's father, with the results expected on July 28. Brent attached his voluntary acknowledgment of paternity. Brent alleged that Erika had wrongfully attempted to "procure the child from [him] in an effort to remove the child from the State of Nebraska" and asked the court for an order granting him temporary possession of Aiden to keep him in Nebraska during the pendency of the paternity action. Brent sought sole custody of Aiden, subject to Erika's visitation rights, and a determination of child support.

On July 30, 2010, both parties filed affidavits with the court, stating, among other things, that they had "discussed [Aiden] and agree[d] that [they] should both take a cooperative and active role in raising [him]." The parties informed the court that they had discussed Aiden's best interests; organized their discussion into a parenting plan, which they had signed; and asked the court to approve the terms of the parenting plan.

The district court entered a temporary order on August 2, 2010. The court found that based on the genetic testing performed, Brent was Aiden's father. The court also found that the July 30 parenting plan submitted by the parties was in Aiden's best interests. The court awarded the parties temporary joint legal and physical custody of Aiden. A child support calculation was completed, but the parties agreed that no child support would be owed by either party since they were equally contributing to Aiden's care. The court found that this deviation from the child support guidelines was fair, equitable, and in Aiden's best interests. The parenting plan was attached to the order and provided for parenting time on a 2-week rotating basis, subject to holiday and special visitation provisions, which were also set forth in the plan. The plan provided that during the first week, Brent would have Aiden from 9 a.m. Monday until 9 a.m. Wednesday, Erika would have Aiden from 9 a.m. Wednesday until 9 a.m. Saturday, and Brent would have Aiden from 9 a.m. Saturday until 9 a.m. Monday. During the second week of the schedule, Erika would have Aiden from 9 a.m. Monday until 9 a.m. Tuesday, Brent would have Aiden from 9 a.m. Tuesday until 9 a.m. Saturday, and Erika would have Aiden from 9 a.m. Saturday until 9 a.m. Monday. The plan also provided each party with the right of first refusal any time in which daycare or a babysitter was needed for a period of 3 hours or more.

Erika filed an answer and countercomplaint on January 6, 2011. In her countercomplaint, Erika sought, among other things, an award of sole temporary and permanent custody, and a determination of child support.

On February 8, 2011, Erika filed a motion to strike the previously filed parenting plan and replace it with a temporary order. She also filed a motion for a temporary order, in which she requested temporary custody and child support. The outcome of these temporary motions is not apparent from the record on appeal.

Trial was held before the district court on March 15, 2012. Erika and Brent both testified, as did Erika's husband, Jesse Robinson (Jesse). Additionally, Dr. Theodore DeLaet, a psychologist, testified about his psychological evaluation of Erika.

Both parties testified about the events that led to the signing of the July 2010 parenting plan. In approximately the second or third week of July 2010, Brent had taken Aiden to Omaha per the parties' verbal shared-custody arrangement. Erika testified that although she thought she would be able to abide by their verbal agreement, as a "first-time mother," she found it difficult to be separated from Aiden. A few days after Brent took Aiden to Omaha for his first block of parenting time, Erika traveled to Omaha and told Brent she wanted to take Aiden back to South Dakota where she then lived. She also informed Brent that she had hired an attorney in South Dakota. Erika's intention at the time was to have full custody of Aiden and raise him in South Dakota. When she arrived in Omaha, she attempted to see Aiden, but according to Erika, Brent would not let her see Aiden until she signed the parenting plan. Brent expressed remorse at trial for not letting Erika see Aiden when she came to Omaha; however, he feared that Erika would take Aiden back to South Dakota and that he would not be able to see Aiden for a long time. According to Brent, the parenting plan was to be signed on Friday at the end of what had been his week under their verbal arrangement, and he told Erika she could not see Aiden until the plan was signed "because we had the week time frame." Erika testified that Brent told her that she could not see Aiden for 2 to 3 months unless she signed the parenting plan.

Erika went to the office of Brent's attorney to sign the parenting plan, and she agreed that she had the opportunity to consult with her attorneys in South Dakota prior to doing so. Erika agreed that she was able to see Aiden once she arrived at the attorney's office. Erika testified that although she signed the July 2010 parenting agreement, she did not feel that it was in Aiden's best interests at that time or at the time of trial. She testified that when she signed the plan, her main focus was on seeing Aiden and the chance to see him was what motivated her to sign the plan.

The parties have basically followed the parenting time set forth in the July 2010 parenting plan, although there have been deviations, some of which were voluntary. Because of the right of first refusal in the temporary parenting plan, Erika was able to see Aiden most weekdays, but once Brent changed jobs, she was able to see him less frequently. According to Erika, prior to this job change, Aiden was in her possession 75 percent of the time. Erika testified that Brent has rarely asked her for extra time with Aiden. Erika stated that Brent is sometimes late in picking Aiden up and that there have also been occasions when he has not shown up at all for a custody exchange. According to Erika, she has never failed to exercise her parenting time and has never been more than 15 minutes late to pick Aiden up. Erika has prevented Brent on occasion from having parenting time, including one occasion when Aiden was sick and Erika had concerns about a winter storm.

Aiden has severe asthma for which he takes medication and uses a nebulizer, and Erika said she felt that the temporary parenting plan did not provide Aiden with enough stability due to his condition. Erika expressed concerns about Brent's taking Aiden to work with him, especially in cold weather due to Aiden's asthma. According to Erika, she is the one who takes Aiden to most of his doctor appointments. Brent testified that Erika was the parent who took the main responsibility for Aiden's medical care, because she would not allow Brent to do so.

Erika testified that the custody schedule in the temporary parenting plan was convoluted and unwieldy. She asked the court for sole physical custody of Aiden and a visitation plan that would give Brent visitation every other weekend and maybe one night during the week at her

discretion. She felt that a more routine schedule would be better for a child Aiden's age and testified that the current plan would not work at all once Aiden reached school age.

Brent felt that the temporary parenting time schedule was in Aiden's best interests because it allowed him to spend nearly equal time with both parents. He did note that the temporary schedule gave him slightly more parenting time than Erika and suggested an alternating parenting time schedule of Monday through Tuesday, Wednesday through Thursday, and Friday through Sunday. Brent testified that his proposal would provide more stability and less chance of conflict with Erika because there would be fewer custody changes. We note that there are in fact the same number of custody exchanges in Brent's proposal; his plan simply equalizes the number of days each parent has custody during a 2-week period in comparison to the temporary plan. Brent asked the court for full custody of Aiden, but he also testified that Erika should have just as much time with Aiden. He did feel that there needed to be one person designated to make final decisions if the parties could not get along. Brent testified that it is in Aiden's best interests for both parties to continue to have as much parenting time as possible. Although Brent agreed that the shared custody arrangement could be difficult once Aiden reached school age, he believed that his plan would be sustainable if the exchanges took place at school.

The parties both testified about their communication issues and difficulty getting along with one another. According to Erika, the parties communicate primarily through text messaging and sometimes e-mail. Verbal communication occurs during custody exchanges. There have been physical altercations between the parties, and the police have been called on numerous occasions, although charges have never been filed as a result of these altercations. Both parties testified to violence against them by the other party. Erika testified that the parties exchange custody of Aiden at the police station for the safety of both parties because of the potential for violence between them.

Erika agreed that Aiden is bonded to Brent but admitted that she has previously asked Brent to relinquish his parental rights, the most recent occasion being a couple of weeks prior to trial. Erika also agreed that she has offered Brent money to relinquish his rights, but she testified that she was not serious in her offer of money. Erika denied that her requests stemmed from a desire for her husband, Jesse, to adopt Aiden. She testified that it stemmed from a desire to put Aiden in a happy and stable environment and that she would not force Aiden or Jesse into an adoption. She testified that she was not attempting to exclude Brent from Aiden's life.

Erika and Jesse married on April 6, 2011. Jesse has full custody of his 9-year-old son from a prior relationship. According to Jesse, Erika is a "mother figure" to this child. Erika and Jesse also have one son together, who was 7 weeks old at the time of trial. According to Jesse, he treats Aiden the same as his sons, and Aiden integrates well when he is there. Jesse feels that there is a brotherly bond between his oldest son and Aiden.

Erika has not been employed since July 2011 when she quit her job at a daycare where she was earning minimum wage. Prior to that job, she was in a job where she earned $11 per hour. Since July 2011, she has been a "stay-at-home mom" and has attended school via online courses.

Prior to trial, the court ordered that either party could obtain a psychological evaluation of the other. Brent sought an evaluation of Erika, and she was evaluated by DeLaet in August

and September 2011. The evaluation was solely a psychological evaluation and not a custody evaluation. DeLaet did not offer any opinion on Erika's parenting ability. DeLaet diagnosed a generalized anxiety disorder and offered a "rule-out diagnosis" for an unspecified depressive disorder. Erika had been previously diagnosed with and treated for depression, but she was not on any antidepressant medication at the time of DeLaet's assessment. DeLaet felt that anxiety was her current predominant clinical symptom. He also diagnosed attention deficit hyperactivity disorder (ADHD). Erika was previously diagnosed with ADHD in elementary school and took medication for it until around age 17 or 18. DeLaet did not diagnose any personality disorder, but he noted some significant personality factors that he found relevant to treatment and of potential interest to the court. Erika did reveal the presence of narcissistic, obsessive-compulsive, and histrionic traits with sadistic features. According to DeLaet, someone with narcissistic traits will tend to be more focused on themselves than others. Individuals with obsessive traits will tend to think or worry too much about things, and those with compulsive traits develop repeated or compulsive behaviors to help calm their anxiety. People with histrionic traits tend to be very emotional, potentially overly emotional, and tend to be more highly reactive to things that go on. People with sadistic features to their personality may hold grudges and want to get even when they feel they have not been treated well. DeLaet noted that Erika had a significant level of distress associated with her "highly conflicted relationship" with Brent, but Erika did not appear to show active symptoms of posttraumatic stress disorder based on DeLaet's observation and the available information. Erika was 17 weeks pregnant at the time of the assessment, and DeLaet took into consideration hormonal and mood changes often associated with pregnancy in offering his diagnostic impressions. DeLaet recommended that Erika enter into individual outpatient mental health therapy to address the issues identified in his report, that she consult with her physician about the need for a mood-stabilizing medication and ADHD medication, and that she familiarize herself with either a class for divorcing parents or any recommended reading material.

Erika testified that she was not on medication for ADHD at the time of trial. She attended therapy following the evaluation, but stopped within approximately 90 days of trial due to complications with her pregnancy and scheduling issues caused by frequent doctor visits.

During the pendency of the action, Brent lived in Omaha and had recently moved to La Vista, Nebraska, at the time of trial. Brent lives alone in a two-bedroom apartment with Aiden. He testified about Aiden's schedule when he has parenting time and about the things they do together. On September 27, 2011, Brent was hired as an independent subcontractor for C-ME Inspections to complete work as a mortgage field inspector. His job involves performing field inspections, which includes taking pictures of the exteriors of houses from his car, as well as doing interior inspections, which includes entering empty homes and taking pictures inside. Brent does not have set work hours. He does occasionally take Aiden with him when he is performing exterior field inspections, but he usually works on days that he does not have Aiden. On the days when Brent has Aiden with him, he typically works only 2½ to 3 hours. Brent feels that Aiden is safe with him when he is working.

Since he is self-employed, Brent pays his own expenses and taxes from his gross earnings. Brent spends about $700 a month on fuel. Other expenses include food and vehicle maintenance. He testified that his monthly work expenses average between $900 and $1,100.

Brent is paid per order or inspection rather than by the hour. His income varies because he does not receive the same number of orders each month. Between September 27, 2011, and the end of 2011, Brent received total income from C-ME Inspections of $17,448, or approximately $5,816 per month. Brent estimated that he currently earns an average of $5,200 or $5,300 per month before taxes and expenses. Brent submitted proposed child support calculations assigning him total monthly income of $4,100, which is his estimate of gross income after deduction of his business expenses.

Following closing arguments, the district court informed the parties that it would not announce its decision that day, but before adjourning, it took time to admonish the parties as follows:

> You've got to get along. It's as simple as that. You've got to communicate appropriately. You don't need to be yelling and screaming and things of that nature. And anytime -- any pick-up or drop-off should be at each others' respective dwellings, not at some police station.

> I mean, if the two of you can't get along because -- and you have to have the police station to protect yourselves, well, that means one or both of you aren't very good parents because you've got to get along because that's what [is] in the best interest of the child. If it's in the best interest of the child and if you love your child, then you'll do that. Again, if your selfishness rises above your level -- or the love for your child, then you won't do that. It's as simple as it gets.

On May 11, 2012, the district court entered a paternity decree. The court found that both parties were fit and proper persons to be awarded joint physical custody of Aiden, but it awarded sole legal custody to Brent. The court stated, without further elaboration, that its custody award was based on the evidence submitted and the parties' testimony. The court accepted the parenting plan submitted by Brent with some modifications to the parties' regular parenting time and vacation time. Specifically, the court ordered that beginning at 9 a.m. on Monday, April 2, Erika would have parenting time until 9 a.m. on Wednesday; Brent would have parenting time from 9 a.m. Wednesday until 9 a.m. Friday; and Erika would have parenting time from 9 a.m. Friday until 9 a.m. on Monday. The court ordered the rotation to continue in this fashion unless agreed upon by the parties and subject to the holiday and vacation time set forth in the plan. As to vacation time, the court found that the parties would each have two 1-week periods with Aiden during the summer months, and it set forth details of how the parties were to choose their 1-week periods.

Based upon the joint physical custody arrangement, the court ordered Brent to pay Erika $242 per month in child support. The court attached a series of child support worksheets showing its calculations, which took into account Jesse's child from a prior relationship, Erika and Jesse's child, and the joint physical custody award in this case. In calculating child support, the court assigned $4,100 per month as Brent's total monthly income and $1,906 as Erika's total monthly income, based on her prior salary of $11 per hour.

Erika filed a motion for new trial, which was overruled by the district court on June 13, 2012. Erika subsequently perfected her appeal to this court.

ASSIGNMENTS OF ERROR

Erika asserts that the district court erred in (1) awarding Brent sole legal custody, (2) awarding the parties joint physical custody, and (3) determining Brent's income for purposes of calculating child support.

STANDARD OF REVIEW

In a filiation proceeding, questions concerning child custody determinations are reviewed on appeal de novo on the record to determine whether there has been an abuse of discretion by the trial court, whose judgment will be upheld in the absence of an abuse of discretion. *Jeffrey B. v. Amy L.*, 283 Neb. 940, 814 N.W.2d 737 (2012). In such de novo review, when the evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. See *Hill v. Hill*, 20 Neb. App. 528, 827 N.W.2d 304 (2013).

While a paternity action is one at law, the award of child support in such an action is equitable in nature. *Citta, supra*. A trial court's award of child support in a paternity case will not be disturbed on appeal in the absence of an abuse of discretion by the trial court. *Id.*

ANALYSIS

*Legal Custody.*

Erika asserts that the district court erred in awarding sole legal custody to Brent. She argues that there are no facts in the record which would support this award and that, at a minimum, the parties should have been awarded joint legal custody. Joint legal custody has been generally defined as joint authority and responsibility for making major decisions regarding the child's welfare. *Elsome v. Elsome*, 257 Neb. 889, 601 N.W.2d 537 (1999). The record shows that the parties do not get along well with one another and have communication issues. Brent testified to his belief that there needed to be one person to make final decisions involving Aiden. Further, Erika's attempts to obtain a relinquishment of parental rights from Brent put into question her decisionmaking abilities relative to Aiden. We find no abuse of discretion in the award of sole legal custody to Brent.

*Physical Custody.*

Erika next asserts that the district court erred in awarding the parties joint physical custody of Aiden. She argues that she should have been awarded sole physical custody, subject to Brent's reasonable parenting time.

Joint physical custody means mutual authority and responsibility of the parents regarding the child's place of residence and the exertion of continuous blocks of parenting time by both parents over the child for significant periods of time. *Elsome, supra*; *Hill, supra*.

We first discuss the propriety of awarding joint physical custody in this case where neither party specifically requested it. When a trial court determines at a general custody hearing

that joint physical custody is, or may be, in a child's best interests, but neither party has requested this custody arrangement, the court must give the parties an opportunity to present evidence on the issue before imposing joint custody. *Zahl v. Zahl*, 273 Neb. 1043, 736 N.W.2d 365 (2007). In this case, the parties both requested sole custody in their pleadings and at trial. Brent, however, also asked the court at trial to award equal parenting time, and the temporary parenting plan contained a joint physical custody arrangement. The parties both presented evidence on the issue of joint custody at trial. Accordingly, we do not find, nor does Erika allege, any due process error with respect to the joint physical custody award.

We next discuss whether the district court erred in not making a specific finding that joint physical custody was in Aiden's best interests. Neb. Rev. Stat. § 42-364(3) (Cum. Supp. 2012) provides that in dissolution cases, if the parties do not agree to joint custody in a parenting plan, the trial court can award joint custody if it specifically finds that it is in the best interests of the child or children. *State ex rel. Amanda M. v. Justin T.*, 279 Neb. 273, 777 N.W.2d 565 (2010). In *State ex rel. Amanda M.*, the Nebraska Supreme Court discussed the requirement of such a best interests finding in the context of a paternity case subject to the Parenting Act. After determining that the Parenting Act applied to the case, the court discussed the interplay between the Parenting Act found in chapter 43 of the Nebraska statutes and the dissolution of marriage statutes found in chapter 42. The court noted Neb. Rev. Stat. § 43-2929 (Reissue 2008) of the Parenting Act, which requires a parenting plan serving the best interests of the child, and Neb. Rev. Stat. § 43-2923 (Reissue 2008), which identifies best interests of the child requirements. The Supreme Court then determined that the trial court had created a parenting plan that included a custody provision following the statutory criteria listed in § 43-2923. The court observed that in contrast to § 42-364 of the dissolution of marriage statutes, the Parenting Act does not explicitly require that a trial court make a specific finding that joint custody is in the best interests of the child when ordering joint custody in a paternity case. *State ex rel. Amanda M., supra*. The Supreme Court found no evidence that the minor child's best interests did not guide the trial court's decision in its award of custody. The court stated, "Although it is preferable to make a finding that the best interests of the child dictate the result, it is not error under the Parenting Act in a paternity case to fail to make a specific finding of best interests." *Id.* at 280, 777 N.W.2d at 571. Similarly, we find no error in this case in the district court's failure to make a specific finding of best interests.

Finally, we address whether the district court erred in awarding joint physical custody. On the one hand, the parties in this case clearly have had serious communication and relational problems, including instances of physical violence and verbal abuse. There is no evidence in the record about how these incidents impacted the child, although Brent testified about one incident that occurred in Aiden's presence that involved Erika kicking Brent in the stomach. On the other hand, it is clear that both parents are very bonded with Aiden and understand the importance of Aiden's having the other parent in his life. Aiden has been in the parties' joint physical custody for essentially his entire life, and the parties have generally been able to follow the terms of the temporary joint custody agreement for nearly 2 years. Having reviewed the record de novo, and giving weight to the fact that the trial court heard and observed the parties, we can find no abuse of discretion in the court's award of joint physical custody of Aiden, and we conclude that such is in his best interests. We impress upon the parties the importance of complying with the terms

of the parenting plan adopted by the trial court, particularly as it relates to positive communication and cooperation to foster and promote a safe, secure, and loving environment for Aiden.

*Child Support.*

Finally, Erika asserts that the district court erred in determining Brent's income for purposes of calculating child support. The court assigned Brent total monthly income of $4,100, which is the figure used by Brent in his proposed child support calculations. Erika argues that the evidence indicated Brent's income was at least $5,300 per month in the months leading up to trial and that Brent's "speculative costs" should not have been factored into the child support calculation. Brief for appellant at 8. Brent is a self-employed contractor, responsible for his own expenses and taxes. Brent testified that his monthly business expenses average between $900 and $1,100, most of which is gas, and that once these business expenses are taken out, his monthly income, before taxes, is $4,100. The district court did not abuse its discretion in assigning Brent total monthly income of $4,100 for purposes of child support.

## CONCLUSION

We find no abuse of discretion by the district court in its award of sole legal custody to Brent, in its award of joint physical custody to the parties, and in its calculation of Brent's total monthly income. We affirm the decree in all respects.

AFFIRMED.